## SIMON MANDLEBAUM *vs.* THE NORTH AMERICAN MINING COMPANY.

A certificate of shares of the stock of an incorporated Mining Company was lost, or stolen from the owner's possession, having attached to it a blank power of attorney for its transfer, signed by the original holder, of whom the loser purchased it. The owner, upon the loss, notified the Company thereof, and not to transfer the stock on its books without his consent. Upon this notice the Company instructed the loser how to proceed to obtain a new certificate; but he never proceeded for that purpose. Four months afterwards, the certificate, with the blank power of attorney annexed, was purchased of one who had possession of it, by a purchaser who had no knowledge of the loss, and who bought in good faith. The purchaser induced the Company, against the previous caution of the loser, to transfer the stock on its books, and issue him a new certificate, which he then sold to the plaintiff. The plaintiff applied to the Company for a transfer on its books, and a certificate to him, which the Company refused, alleging the dispute about the ownership as a reason for such refusal.

Simon Mandlebaum *vs.* The North American Mining Company.

*Held,* that although plaintiff bought with full knowledge of all the facts known to his vendor, and of his vendor's knowledge of them, the Company, by permitting the transfer to said vendor, and the issue of such new certificate, were estopped from denying plaintiff's ownership, and refusing the transfer to him.

By Section 7, Chapter 55, of the Revised Statutes, certificates of shares of stock, in Companies organized pursuant to said Chapter, may be transferred by endorsement and delivery, so as to confer a valid title as between the parties thereto; and *semble,* that the holder of a certificate so endorsed and transferred, is entitled to the same rights respecting it, as against third parties, which the law confers upon the holder of commercial paper.

Case reserved from Wayne Circuit.

On the 4th day of December, 1851, the defendant was an incorporated Mining Company, duly organized under and by virtue of the laws of this State.· On that day, the defendant, by its officers, issued and delivered to one H. J. Buckley, a resident of the City of Detroit, a certificate of stock of said Company. In December, 1852, Buckley sold said stock to one William A. Pratt, and at the same time· delivered said certificate, with a blank power of attorney attached, signed and sealed and subscribed by two witnesses. The name of no attorney or assignee was inserted in the power of attorney, and it was in the form following : " Be it known to all whom it may concern, that      do hereby constitute and appoint      true and lawful attorney for      and in      name to transfer forty-two shares in the capital stock of the North American Mining Company of Detroit.

Witness      hand and seal at      this day of      A. D. 185

H. J. BUCKLEY [seal].

Witnesses present, E. W. Fitzhugh, William T. Wheeler.

In December, 1852, said certificate, with the power of attorney attached, was stolen or taken from the possession· of said William A. Pratt, without his knowledge or consent,

by some person unknown, and in a few days afterwards the Company was notified of the loss. Also, that Pratt was the owner of said certificate, and the Company was requested for that reason not to transfer said stock upon the Company's books, at the request of any person. Pratt was guilty of no negligence on the loss of the certificate, but it was proved that he exercised ordinary care and prudence in the preservation of it.

On the 2d of May, 1853, Walter Ingersoll, in good faith, and without any knowledge of the loss of the certificate, purchased it of one William Martin, and paid for it fourteen hundred dollars. On purchasing, he ascertained the name and residence of Martin, and made the inquiries usual in a transaction of that kind.

On the 9th of May, 1853, the Company, at the request of Ingersoll, and with a full knowledge of Pratt's claim to the certificate, transferred the same on its books by canceling it, and issuing a new one directly to Ingersoll. Ingersoll was notified of Pratt's claim to the certificate before this transfer. In March, 1854, Ingersoll sold the certificate to the plaintiff in this suit, informing the plaintiff at the time, of Pratt's claim to the stock, and of his (Ingersoll's) knowledge of all the facts above stated. Afterwards, and on the 21st of April, 1854, the plaintiff presented said certificate to the Company, and requested the same to be transferred to him on the Company's books, but the Company refused to make the transfer, alleging that they would not make the transfer until the title to the stock was settled between him and Pratt.

When Pratt notified the Company of the loss of the certificate in December, 1852, the Company wrote him, advising him that the certificate had not been presented at its office for transfer, and directing him to advertise the loss at the place of the loss, and also at Pittsburgh, at least six weeks; and informing him, that the by-laws of the Company required a good and sufficient bond of indemnity against all

losses, costs, etc., which the Company "might sustain in reject-
ing, or in any way connected with the transaction, before a new
certificate could be issued;" and also offering, in case the
certificate could not be found, to do anything to obtain a
reissue that the proper officer of the Company was autho-
rised to do. Pratt never complied with the directions con-
tained in the letter, by giving the notice and executing the
bond therein mentioned, nor took any other steps to supply
the loss.

The certificate of stock in question was made on its face,
"Transferable only on the books of said Company (upon the
return of this certificate), in person or by attorney duly
authorized, at their office in the City of Pittsburgh, in the
State of Pensylvania, or at such other office as may be
hereafter established."

It was usual and customary for persons dealing in the stock
of the Company, as well as that of other Companies, to
transfer the same by delivery merely, without any written
assignment, and with a general understanding among the
dealers in stock certificates, that there was an implied power
or right in any subsequent assignee to fill up the blank in the
power of attorney attached to such certificate with the names
of the attorney and assignee, as might suit the convenience
of the holder, and this was not usually done in the market,
but only when the assignee wished to have a transfer of the
stock on the books of the Company. Such custom, at the
time Ingersoll became the purchaser of the stock, was proved
to be almost universal in Michigan, where the stock was
purchased.

Upon the refusal of the Company to make the transfer, the
plaintiff brought an action on the case for such refusal. The
defendants, under the plea of not guilty, gave notice of the
loss of the certificate by the former owner, etc., and the Court
below (Hon. David Johnson presiding) reserved the case for
the opinion of this Court.

*J. V. Campbell*, and *W. P. Wells*, for plaintiff.

1. The stock was negotiable by endorsement and delivery, and any *bona fide* holder was entitled to claim its transfer on the books. (*R. S., p.* 212, § 7.) The object of the transfer is the protection of the Company, and not to give validity to the assignment, which is good without registry on the books. (*Bank of Utica* vs. *Smalley*, 2 *Cow.*, 770; *Quines* vs. *Marblehead Social Ins. Co.*, 10 *Mass.*, 476; *Nesmith* vs. *Washington Bank*, 6 *Pick.*, 324; *Sargent* vs. *Franklin Ins. Co.*, 8 *Ib.*, 90; *Sargent* vs. *Essex Marine Railway Corp.*, 9 *Ib.*, 202; *Black* vs. *Zacharie*, 3 *How.*, 513, 514, *and Mr. Petigru's deposition, pp.* 488, 489; *Gilbert* vs. *Iron Manufacturing Company*, 11 *Wend.*, 627; *Kortright* vs. *Buffalo Com. Bank*, 20 *Ib.*, 91; *S. C.*, 22, *Ib.*, 348; *A. & A. on Corp.*, § 564; *Ins. Co.* vs. *Smith*, 11 *Pa. State Rep.*, 120; 9 *Mo. Rep.*, 149.) When an assignment is made in blank, it will entitle any *bona fide* holder to claim under it. (*Kortright* vs. *Buff. Com. Bk., Supra; Putnam* vs. *Sullivan*, 4 *Mass.*, 45; *Russell* vs. *Langstaff, Doug.*, 514; *England* vs. *Roper*, 1 *Starkie R.*, 304; *Master* vs. *Miller*, 1 *Anst.*, 228; *Stahl* vs. *Bergen*, 10 *S. & R.*, 170 ; *Ex parte Kerwin*, 8 *Cow*, 118 ; *Bank of Com'th.* vs. *Curry*, 2 *Dana*, 142; *Same* vs. *McCord*, 4 *Ib.*, 191; *London Grand Junction Railway Co.*, vs. *Freeman*, 2 *Railway Ca.*, 468, 503; *Sheffield Railway Co.* vs. *Woodcock*, 7 *Mees. & Welsb.*, 584; *Birmingham Railway Co.* vs *Locke*, 1 *Ad. & El. N. S.*, 256.)

The rule established by the above cases is, that acts whereby third persons may be innocently misled operate as an estoppel, or in the nature of such, against those who have so acted. Parties may waive all the legal machinery which, without such waiver, would be necessary to carry out their designs. (*Cheltenham & G. W. U. Railway Co.* vs. *Daniel*, 2 *Railway Ca.*, 728; *S. C., Ib.*, 867, 870; *Coles* vs. *Bank of England*, 10 *Ad. & El.*, 437.) In the latter case the transfer

was under a forged power, and the owner's negligence was held to work an estoppel. As to such estoppel, see Pickard *vs.* Sears (6 *Ad. & El.*); Gregg *vs.* Wells (10 *Ib.*, 90); Freeman *vs.* Cooke (2 *Exch. R.*, 654.)

2. The plaintiff would be entitled to recover in any event, because the stock was reissued to Ingersoll, who held in his own name the legal title to it. (*Davis vs. Bk. of Eng.*, 2 *Bing.*, 393; *Ambler*, 503.) 2d Peere Wms., 78, is to the contrary, but it is remarked in a note appended to the case, that. that decision has not been followed. In Pollock *vs.* National Bank (3 *Seld.*, 274), the Bank was held liable upon the principles of Davis *vs.* Bk. of England.

3. The authorities under the first head, show the action rightly brought. The damages should be the value of the stock and interest from the time of refusal.

*Howard, Bishop & Holbrook,* for defendants.

The Revised Statutes, Ch. 55, Sec. 7, require the endorsement and delivery of the certificate by the proprietor, the endorsement being by the signature of the proprietor, or his attorney or legal representative; and the transfer is not valid as to third parties, until entered on the books of the Corporation. A certificate of stock is only *evidence* of property. (*A. & A. on Corp.*, 483.) It is not negotiable like a note or bill; its title, however, may pass by the endorsement and delivery of the owner, but not without his consent. It does not pass by transfer, under a forged power of attorney. (*Davis vs. Bk. of Eng.*, 2 *Bing.*, 393; *Pollock vs. Nat. Bk.*, 3 *Seld.*, 274.) A stolen bank note may be recovered from any one but a *bona fide* holder. (*Solomons vs. Bk. of England*, 13 *East.*, 135.) The contents of a lost bond may be recovered of a *bona fide* holder for converting it. (*Biddle vs. Bayard*, 13 *Pa. State Rep.*, 150.)

2. Ingersoll purchased of a stranger. The power of attorney being in blank, was not evidence of ownership in Martin,

and Ingersoll was bound to know it. (*Dunn* vs. *Commercial Bank*, 11 *Barb. S. C. R.*, 580; 4 *Wharton*, 382.) Had the stock been issued and payable to bearer, the possession of the certificate was not evidence of ownership. (*Daly* vs. *Thompson*, 10 *Mees. & Welsb.*, 309.) The custom of transferring certificates of stock by blank endorsements and powers of attorney, is sufficient to require at least some knowledge beyond the paper, as to who owns it, and cannot prevail against the statute. (*Kortright* vs. *Com'l Bk.*, 22 *Wend.*, 362.)

3. The plaintiff's title was Ingersoll's title. Ingersoll's knowledge as to the wrongful reissue of the certificate, his knowledge and his title no better than if transferred to him under a forged power of attorney. (*Hilyard* vs. *South Sea Co. and Keate*, 2 *Peere Wms.*, 76.)

The Company was bound not to transfer to Ingersoll's assignee; Ingersoll having full knowledge of the loss, and Pratt having notified the Company before Ingersoll's purchase. (*Stebbins* vs. *Phœnix Fire Ins. Co.*, 3 *Paige Ch. R.*, 350; *Kortright* vs. *Com'l Bank, supra.*)

By the Court, MARTIN, J.

The certificate which was issued to Ingersoll by the defendants, became the property of the plaintiff by purchase, and was transferred to him in the manner in which it is found by the Court below. Such instruments are usually negotiated in market. The endorsement was in blank; the power of attorney remaining to be filled up by whatever holder might desire an entry upon the books of the Company of the transfer of the stock, and the issue of a new certificate to himself. By this endorsement and delivery, the transfer was, under our statute, valid, as between the parties thereto. The entry thereof on the books of the Company being only necessary for the benefit and security of the Company, and not to the validity of the holder's title. (*See R. S., Ch.* 55,

§ 7, *p.* 211.) Whatever title, then, Ingersoll had in the stock for which the certificate was issued to him, or acquired by such transfer upon the Company's books and the new issue, this plaintiff now holds; and the transfer of this certificate he asks to have intimated upon the books of the defendants, and for a new certificate to be issued to him thereupon. This request the defendants refuse to comply with, until the title to the stock represented by the original certificate acquired by Ingersoll shall have been settled between this plaintiff and Pratt; and for such refusal this action is brought.

It becomes unnecessary, in the view we take of this case, to inquire into Pratt's title, under the original certificate of stock issued to Buckley; or into that of Ingersoll under his purchase from Martin. Neither is it necessary to inquire into the rights of Pratt as against Ingersoll's title, while the latter held the certificate now owned by this plaintiff, and which was substituted for the one he claims to have owned, nor what may be his rights as against the defendants, or as against this plaintiff, should he assert them by proper proceedings in law or equity. Indeed, there would be an impropriety in doing so, for he does not appear as a party in this suit, nor can we see that it is defended at his instance, or in his behalf. That it is the duty of the Company to allow intimations of transfer of stock to be made upon their books, upon the application of the owners thereof, is not denied, nor is the liability of the Company in case of an improper refusal questioned, and it appears that, upon the entry of the transfer, the Company cancels the original certificate, and issues a new one to the transferee. Before Ingersoll presented his certificate to the defendants in order that the transfer might be thus intimated, and a new certificate issued to himself, and, indeed, before he purchased it from Martin, the defendants had been informed by Pratt of his loss of the certificate he purchased from Buckley, and cautioned against transferring the stock to the holder thereof,

if it should be presented for that purpose. Notwithstanding this caution, the defendants did transfer it upon their books upon Ingersoll's request, canceled the certificate which Pratt claimed,'and issued the one which is the foundation of this controversy. What may have induced the defendants to recognize the title of Ingersoll to the first certificate does not appear; perhaps it was the neglect of Pratt to take the steps for securing them against loss or liability, as prescribed in their letter, which is made an exhibit in this case, or perhaps from the long silence of Pratt, and the lapse of time since the communication to him, it was concluded that he had no valid claim upon it, or that it had been adjusted between him and Ingersoll. However this may be, the transfer seems to have been made by the Company deliberately, and without any fraud or concealment on Ingersoll's part. Had they refused the request of Ingersoll, and compelled him and Pratt to interplead respecting, or otherwise to settle their conflicting claims to the certificate, they could have fully protected themselves against the consequences of any transfer, and new issue which might thereafter be made, pursuant to such settlement; but not having done this, and having recognized Ingersoll's title, canceled the original certificate, and issued a new one to him, they cannot now be permitted to question the genuineness of that recognition, or the validity of that new certificate upon this claim of Ingersoll's transferee.

When the Company permitted this transfer to Ingersoll to be intimated upon their books, and issued this certificate to him, they well knew that it might, and probably would, pass from hand to hand, upon his endorsement, through numberless *bona fide* holders, before it would be returned for a like intimation of transfer, and new certificate thereupon. It is true that this is not commercial paper, in the strict sense of the term; but by our statute, as has been stated, it is transferable by endorsement and delivery, so as to confer a valid title as between the parties thereto, and is, we think, by this provision

60

of the statute, so far assimilated to such paper, that the holder is entitled to every right respecting it, as against third parties, which the law confers upon the holder of commercial paper. In this respect, the provisions of our statute are unlike those of every charter, and of the by-laws of every incorporated Company to which we have been referred, and upon which adjudications have been made. It enlarges the effect of the endorsement and delivery, and thereby facilitates the transfer of these instruments, thus adding another element of value to them. Once endorsed, the certificate passes from hand to hand, like commercial paper, and an ordinary purchaser would, and under our statute well might regard the usual endorsement, if genuine, as sufficient; and suspicion would naturally be lulled, and inquiry would be silenced beyond such as would, by mercantile law and usage, be required upon the purchase of commercial paper. And if inquiry were further pressed, and the party desirous of purchasing should seek further evidence of the genuineness of the title of his vendor, the entry upon the Company's books corresponding with the issuing of such certificate, would, almost of necessity, impel him to the conclusion that, up to that point, the title was unquestionable, and that behind it he need not pursue his investigations. It would be regarded, and properly too, as the recognition by the Company of a title upon which every subsequent purchaser could safely rely.

Such being the force and effect of the transfer and the certificate to Ingersoll, the defendants are estopped from denying their validity, or from going behind them; and asserting, in defence of this action, a title which was thereby repudiated. Now, when this certificate was issued, the defendants virtually guaranteed its genuineness to whomsoever might become the purchaser of it; and it would operate as a fraud upon the public to permit them, under such circumstances, to question the validity of the instrument, or

to deny their obligation under it. No higher recognition of Ingersoll's title could be given than has been given, and the purchaser from him, or from one deriving title from him, can, by no principle of law or of fair dealing, be required by the defendants to look beyond their books to inquire under what circumstances it was issued. The principle of estoppel is peculiarly applicable to this case, both for the protection of private rights, and upon grounds of public policy. "If," says Parke, B., in Freeman *vs.* Cooke (2 *Exch. R.* 654), "whatever a man's intentions may be, he so conducts himself, that a reasonable man would take the representations to be true, and believe that it was meant that he should act upon it, and he did act upon it as true, the party making the representation would be precluded from contesting its truth." This principle applies as well to Corporations as to individuals, and to acts as to assertions, and with conclusive force when these acts result from deliberate purpose, with a full knowledge of surrounding facts, and are induced by no fraudulent representations or concealments.

Nor is there anything in the circumstances attending the plaintiff's purchase of this certificate which relieves the defendants from the operation of this rule. It is true that he purchased with a full knowledge of all the facts known to Ingersoll; but he also knew that these facts were known to the Company, and that Ingersoll's title had been recognized by them, notwithstanding Pratt's claim, and with full knowledge of it. The very fact that he purchased with such knowledge, is evidence of his reliance upon the acts of the defendants for the protection of his title, and of *bona fides* in making the purchase. He had a right to believe that the defendants had deliberately recognized Ingersoll's title, and had assumed a liability to him and his transferees, after a full investigation of that title, and he had a right to rely upon this new certificate, as an assertion by them of their repudiation of Pratt's claim, and that all persons were safe in

purchasing it, and of their undertaking with whomsoever might become the owner that his title would be recognized. And he may now insist that a responsibility thus deliberately assumed ought not to be resisted by the assertion of that claim which was thus disregarded when the certificate which he holds was issued.

Good faith and public policy require that the defendants should be held to this rule, and it is upon these broad grounds that this doctrine of estoppel stands interposed, to prevent injustice, and to guard against fraud, by denying to a party the right to repudiate his deliberate acts or admissions, when these have been acted upon by those persons to whom they were directed, and whose conduct they were intended to influence.   (8 *Gill.*, 239.)

We have not been referred to, nor have we been able to find upon examination, any case which is precisely parallel with the present, but we think the reasoning of all the cases, and especially of Davis *vs.* the Bank of England (2 *Bing.,* 392), and of Hunter *vs.* The Westminster Internal Improve ment Commissioners (14 *Eng. L. & Eq. Rep.*, 379; *S. C.*, 7 *Exch. R.*, 780), sustains the conclusion to which we have arrived.   In the former of these cases, when certain stock belonging to Davis had been transferred upon the books of the Bank under a forged power of attorney, but, unlike this case, without notice to the Bank, suit was brought for the refusal to pay over the dividends which had fallen due upon the transferred stock, and for permitting the transfer.   The Court held, that the Bank was liable to the plaintiff for not paying over the dividends notwithstanding the transfer ; but in speaking of the rights of subsequent purchasers of the stock transferred under the forged power, they use this lan-guage : "We are not called upon to decide, whether those who purchased the stock transferred to them under the forged power might require the Bank to confirm that purchase to them, and to pay them the dividend on such stocks, or

whether their neglect to inquire into the authenticity of the power of attorney might not throw the loss on them that has been occasioned by the forgeries. But to prevent as far as we can, the alarm which an argument urged on behalf of the Bank is likely to excite, we will say, that the Bank cannot refuse to pay the dividends to subsequent purchasers of these stocks. If the Bank should say to such subsequent purchasers, the persons of whom you bought are not legally possessed of the stocks they sold you, the answer would be, the Bank in the books which the law requires them to keep, and for the keeping which they receive a remuneration from the public, have registered these persons as the owners of these stocks, and the Bank cannot be permitted to say that such persons were not the owners. If this be not the law, who will purchase stock, or who can be certain that the stock which he holds belongs to him? It has ever been an object of the Legislature to give facility to the transfer of shares in the public funds. This facility of transfer is one of the advantages belonging to this species of property, and this advantage would be entirely destroyed if a purchaser should be required to look to the regularity of the transfers to all the various persons through whom such stock has passed. Indeed, from the manner in which stock passes from man to man, from the union of stocks bought of different persons, under the same name, and the imposibility of distinguishing what was regularly transferred from what was not, it is impossible to trace the title of stock as you can that of an estate. You cannot look further, nor is it the practice ever to attempt to look further than the Bank books for the title of the person who proposes to transfer to you."

Although this is *obiter dictum*, yet it is so consonant to reason and sound policy, that we do not doubt the correctness of the principle, nor hesitate to apply it to the case at bar. If, in such a case, the Bank would be prohibited from denying the right of the subsequent purchasers of the stock,

by a much stronger reason, do we think these defendants are estopped from denying this plaintiff's right, since the transfer to Ingersoll was entered upon their books with full knowledge of Pratt's claim of title, and of loss ; and a certificate was issued thereupon to him genuine in form, and containing nothing to excite suspicion, or to suggest inquiry on the part of the purchaser.

Let it be certified to the Circuit Court for the County of Wayne, as the opinion of this Court, that the plaintiff is entitled to recover.

Present, MARTIN, GREEN, WILLSON, BACON, DOUGLASS, JOHNSON, J. J.