"SCARLETT & SCARLETT, INCORPORATED UNDER THE LAWS OF THE STATE OF NEW JERSEY,"

*v.*

FREDERIC W. WARD and THE NEWARK LAND AND IMPROVEMENT COMPANY.

In a suit to compel a transfer of a share of stock, it appeared that after the individuals comprising the firm of Scarlett & Scarlett had organized a corporation under the name of " Scarlett & Scarlett, Incorporated," to carry on the firm business, J., one of the incorporators, and a member of the late firm, on April 11th, 1892, bought, in the name of Scarlett & Scarlett, stock of the Newark Land and Improvement Company, and gave notes in payment there-

for. At that time he had no authority to buy stock for "Scarlett & Scarlett, Incorporated." On April 23d, defendant agreed to become a director of the Newark Land and Improvement Company on condition that he should become the absolute owner of at least one share of stock. It was then agreed to sell to defendant a share of stock owned by W. Thereupon, J. surrendered a certificate which he had taken in the name of Scarlett & Scarlett, caused it to be canceled, and a certificate of the share in suit to be issued in the name of, and delivered to, defendant. Defendant did not see the certificate which had been surrendered, and knew nothing about the ownership of it. Immediate payment of the price of the share was waived, but defendant became liable for it, and afterwards tendered it. On April 30th, J. reported, at a meeting of the directors of "Scarlett & Scarlett, Incorporated," that he had purchased for that company the stock which he had taken in the name of Scarlett & Scarlett, and the purchase was ratified.—*Held,* that the ratification did not affect defendant's title to the share in suit, as against "Scarlett & Scarlett, Incorporated," as defendant was a *bona fide* purchaser before the ratification.

On bill, answer, replication and proofs in open court.

*Messrs. Colie & Swayze,* for the complainants.

*Mr. Frederic W. Stevens,* for the defendants.

GREEN, V. C.

"The Newark Land and Improvement Company" was incorporated under the provisions of the act of this state entitled "An act to encourage the improvement of real property in this state," approved March 27th, 1874, and the several supplements thereto. Its authorized capital stock is $100,000. The certificate declares that the amount with which the company will commence business is $10,000. The capital stock originally issued consisted of two hundred shares, of the par value of $50 each, held as follows: J. Miller Roe, ninety-eight shares; Charles Selvage, ninety-eight shares; William Scarlett, one share; John B. Scarlett, one share; George O. Scheerer, one share, and Isaac F. Roe, one share.

Charles Selvage sold twenty-four of his ninety-eight shares to William Scarlett and twenty-four to John B. Scarlett, for which they paid no cash, but each hypothecated his twenty-five shares with Charles Selvage, as security for the purchase-price. Wil-

liam and George O. Scheerer had acquired forty-nine of the Roe shares. This left the stock of the company distributed equally between Charles Selvage and the Scarletts on one side, and the Roes and Scheerers on the other.

On the 6th of April, 1892, Charles Selvage and John B. Scarlett negotiated for the purchase of the Scheerer and Roe stock, and agreed, finally, to take the same at $120 a share, Charles Selvage buying out Mr. Roe's interest and John B. Scarlett buying out the Scheerer interest for Scarlett & Scarlett, both being fifty shares each.

The deal was consummated on the 11th of April, 1892, and the consideration, $12,000, was arranged to be paid, as to one-half, by Charles Selvage, by his six several notes of $1,000 each, falling due every three months, payable to the order of Scarlett & Scarlett, endorsed by John B. Scarlett, "Scarlett & Scarlett" (four of these notes, with evidences of payment, were produced on the trial), and as to the other half of said consideration, by John B. Scarlett, by six other notes, said to be similar to the first-named in date, time and amount, but signed by John B. Scarlett, "Scarlett & Scarlett," payable to the order of Charles Selvage and by him endorsed. The form in which these notes were drawn is uncertain, as none were put in evidence.

Until September, 1891, William Scarlett and John B. Scarlett were partners, under the name of Scarlett & Scarlett, carrying on the business of surveyors, making maps &c., in the city of Newark. At the date named they, in connection with their father, Augustus Scarlett, formed a corporation under the name, as stated in the certificate of organization, of "Scarlett & Scarlett, Incorporated under the Laws of New Jersey." The objects of the corporation, as indicated by the certificate, were practically to continue the business of the copartnership as well as the purchase and sale of real estate, stocks and bonds. The capital of $50,000 was divided into five hundred shares, of $100 par value; the company to commence business on thirty-one shares, of which fifteen were issued to William Scarlett and fifteen to John B. Scarlett for the business and property of the firm of Scarlett & Scarlett, purchased for $3,100 in stock, one share

thereof being issued to Augustus Scarlett for services rendered the partnership. Afterwards one share of preferred stock was issued to Mr. Smyth and to Mr. Hope respectively, for debts due them from the firm, the par value of which was to be charged to William and John B. Scarlett on account of salary, and one share was issued to Sarah B. Scarlett for cash actually paid. Augustus Scarlett, William Scarlett and John B. Scarlett were the directors, Augustus being president, William the vice president and John B. secretary and treasurer. The business and assets of the copartnership were thereupon turned over to the corporation and the copartnership dissolved, notice of such dissolution being published in the newspapers.

· The corporation was, therefore, but the evolution of the partnership. The name of the latter became the distinguishing feature of that of the former. The assets were transferred and the business continued at the same place, the old style and letterheads being used. The two brothers were, in interest, practically the company, together controlling all corporate action, as they constituted a majority of the directors, and under the by-laws each was clothed with absolute power, in the absence of the president, their father, and he was, in fact, absent from every meeting from October 3d, 1891, to September 19th, 1892.

In the transaction of the purchase of the shares of the land company and the signing and endorsing of the notes, so far as appears, there was no mention made of the corporation nor of the partnership, but Charles Selvage states distinctly that he endorsed the notes with the understanding at the time that he was going security for William Scarlett and John B. Scarlett.

Walter Selvage became a stockholder of the Newark Land and Improvement Company by the transfer to him by Charles Selvage of a portion of his stock, and the two Selvages and two Scarletts were made directors, leaving one vacancy in the board of directors.

Walter Selvage was elected president, Charles Selvage, treasurer, and John B. Scarlett, secretary of the company.

On the 11th of April, 1892, the certificates of the Scheerer and Roe stock were surrendered, and certificates No. 15 for

Scarlett & Scarlett *v.* Ward.

twenty-four shares, No. 16 for one share, No. 17 for twenty-four shares, were issued in the name of "Scarlett & Scarlett," the receipt of which is acknowledged on the respective stubs by John B. Scarlett.   These certificates were afterwards returned to the land company, and are marked "canceled" on their face, in the handwriting of John B. Scarlett, and certificates No. 25 for twenty-four shares, No. 26 for one share, No. 27 for twenty-four shares, were issued in the name of "Scarlett & Scarlett," the receipt of which is acknowledged by John B. Scarlett.   There was another share of the Scheerer and Roe stock which was not traced by the evidence, but the stock at this time was equally divided between the Scarlett interest on the one hand and the Selvage interest on the other, each having fifty shares.   I have thus stated the stock transitions and conditions in detail, because they indicate the true object of this suit and demonstrate that it is not what it purports to be, a contest for one share of the stock, but is for the control of the corporation.

As the result of an invitation, Mr. Frederic W. Ward, on April 23d, 1892, attended at the office of the land company, which was also the office of "Scarlett & Scarlett, Incorporated," &c.

All the directors of the land company, namely, the two Scarletts and the two Selvages, were present, and an informal meeting was held in which the appointment to fill the vacancy in the board was discussed.   There is a conflict in the testimony as to the details of what took place at that meeting.

Without going into an analysis of the evidence or giving in detail my reasons for such conclusions, I am satisfied, from the manner of the witnesses, the probabilities of their stories, corroboration and other considerations, that the true history of the transaction of that evening is as follows:

On the 16th of April, 1892, a resolution was passed by the directors that the president be requested to have Frederic W. Ward attend the next meeting of the board, on April 23d, 1892, to ascertain how the charter could be amended, with general legal advice, which request was communicated to Mr. Ward by Walter Selvage, the president, and in response thereto he attended

the meeting of April 23d, 1892. An informal meeting was first held, and the subject of Ward's being elected a director was brought up. He expressed to them his willingness to act, but stated that it would be necessary for him to become a stockholder in order to be legally qualified to act as such director; that some one suggested to issue to him a share of stock, to which Ward replied that that could not be done legally, and further, that he would not act as a director unless he was the absolute owner of at least one share of stock.

There was then a discussion as to which one of the parties should sell Ward a share. Charles Selvage objected to parting with any more of his, as he had already disposed of some, and John B. Scarlett also objected to part with any of his on the same ground, and it was then said by some one that either Walter Selvage or William Scarlett must let Ward have a share. This was assented to, and, in order to determine which of the two should do so, it was proposed that a cent should be tossed up. John B. Scarlett then tossed the cent, and picked it up and said to his brother William, "You have lost," to which William Scarlett expressed no dissent. There was then talk with reference to the price to be paid for this share, Ward desiring to know what was to be the price. Charles Selvage said that it ought not to be less than $120, as that was the rate which they had paid for the Scheerer and Roe stock. Ward remarked that he thought $120 was a good deal to pay for a $50 share of stock, but finally said, "All right, I will take it."

John B. Scarlett and Charles Selvage then, in the presence of the others, went over to the safe and took therefrom the stock-book. John B. Scarlett thereupon wrote the name of "Scarlett & Scarlett" to the blank power of attorney on the back of certificate No. 26 and surrendered the same, and drew a new certificate No. 29 for one share to Frederic W. Ward. On this being handed by John B. Scarlett to Charles Selvage, for signature as treasurer, the latter noticed that certificate No. 26 did not stand in the name of William Scarlett, but in the name of Scarlett & Scarlett, and said in an undertone, and not in Ward's hearing, to John B. Scarlett, "This is not right; it was one of

William's shares that was to be sold." John B. Scarlett then asked Charles Selvage if he had any of those certificate with him. (It is to be here remembered that all the stock standing in the individual names of William or John B. Scarlett was held in hypothecation by Charles Selvage.) Charles Selvage told John B. Scarlett that he did not have them with him. Thereupon John B. Scarlett said, "That is all right," and the new certificate No. 29 was signed by the president and treasurer, and certificate No. 26 marked "canceled" and retained.

Mr. Ward took no part whatever in this proceeding, did not hear the conversation and did not have certificate No. 26 in his possession. The new certificate No. 29, issued in his name, was then taken over to where he was and delivered to him.

After certificate No. 29 had been delivered to Mr. Ward, he said, " I haven't the money with me, nor my check-book ; I will have to pay you some other time," and William Scarlett said, "All right, any time will do." Ward was then elected a director and acted as such at that meeting.

He afterwards attended every other meeting of the directors and acted as such, either William or John B. Scarlett, or both of them, being always present. This continued without objection until a meeting held October 28th, 1892, when Ward, having discovered that $3,000 had been paid out of the company's funds to meet notes, one given by Scarlett & Scarlett and two by Selvage, the checks for which were signed by John B. Scarlett alone, without any apparent authority, said he would not consent to that transaction, and that the matter must be straightened up or he would resign his office and have nothing more to do with the company.

At this meeting a proposition was made by John B. Scarlett to approve of the payment by him, from the company's funds, of one note of Charles Selvage and one of Scarlett & Scarlett, of $1,000 each, and to " charge the amount to Charles Selvage and Scarlett as dividends." This was opposed by Ward and lost, and then a resolution was offered by John B. Scarlett that " Charles Selvage and Scarlett & Scarlett be and are hereby demanded of to return to the company the money which belonged

to the company, and was used to pay the personal notes of Charles Selvage and the note of Scarlett," setting out two notes of Charles Selvage and one of Scarlett & Scarlett, each for $1,000, " and that the directors hereby declare a dividend of forty per cent., payable immediately on the receipt of the money advanced to Charles Selvage and Scarlett & Scarlett." Ward objected to this resolution and offered an amendment, leaving out the part referring to a dividend, but instructing the treasurer to take proceedings for the return of the money at once, and the resolution in that shape was passed, John B. Scarlett alone voting against it.

John B. Scarlett then offered a second resolution to the same purport, declaring a dividend. Ward still refused to favor it, when Scarlett turned to him and said that he desired that he should vote in favor of it, to which Ward replied that he would never vote for a dividend when the money was not there to pay it, and after some further proceedings John B. Scarlett challenged Ward's right to vote, or to act as a director, on the ground that he was not a stockholder, and insisted that he should not vote. Ward, however, continued to act, the result being this suit, which is brought to restrain Ward from acting as director of the land company, and for a retransfer of the stock held by him.

The claim of the complainant corporation is, that the one share in dispute was, at the time it was transferred to the defendant Ward, the property of the corporation, and that John B. Scarlett had no authority to surrender or dispose of it. It was one of the shares of stock which John B. Scarlett had purchased from William Scheerer on the 11th of April, 1892, paying therefor, as part of the said purchase, the notes signed by John B. Scarlett "Scarlett & Scarlett," to the order of Charles Selvage and endorsed by him.

There is nothing in the case to impeach the entire good faith of Ward in the transaction. He stated to them all that he would not consent to serve as a director unless he was the absolute owner of stock. The transaction by which he was to acquire this stock was therefore carried on with full notice to all that it was to be no similated or temporary transfer, but an actual sale;

the price was not nominal, but at the premium of $70 on a $50 share of stock. He did not hear the conversation between John B. Scarlett and Charles Selvage as to certificate No. 26, and did not have it in his possession, nor was he informed· nor did he know in whose name it stood on the books of the company. He took the new certificate and assumed the liability to pay the agreed price, and accepted the position of director of the land company and immediately entered on the discharge of his duties. He has, as director, faithfully devoted his time, experience and knowledge to the interests of the company.

At the time of the purchase of the stock by John B. Scarlett, April 11th, 1892, so far as the minutes of the board of directors of "Scarlett & Scarlett, Incorporated," show, John B. Scarlett had not been authorized by the corporation to make such purchase for it; and he testifies that prior to a meeting held on the 30th of April, 1892, he had no authority to negotiate a sale or purchase of the shares of stock of the Newark Land and Improvement Company on behalf of the company of "Scarlett & Scarlett, Incorporated;" that he acted entirely without authority in that regard from the company. He reiterated again and again that he had no authority to act for the company in the premises on April 11th, 1892. If this is so, when, if ever, did this company acquire these shares of stock?

The legal title was not in the complainants, for the certificate was not issued in the corporate name of the company, nor does it, by its name, appear as a stockholder upon the books of the land company. Neither does it appear by satisfactory proof that it had the equitable title. As no part of the consideration was paid in cash, an equitable title could only arise in favor of the complainant by its being at the time absolutely liable for the purchase-price. The corporate name of the complainant does not appear on the notes as maker or endorser. Throughout the whole transaction John B. Scarlett used the old partnership name of Scarlett & Scarlett. He had no authority to bind the company in the purchase, and none whatever to execute a note which was obligatory upon the company. Whether he attempted

so to do is not clear. It is true that he gave an affirmative reply to a question, as follows:

"The shares, then, were purchased wholly on the credit of the corporation of Scarlett & Scarlett and on the credit of Charles Selvage, and the purchase-money was wholly represented by the notes that were given?"

But this is a mixed question of law and of fact, depending on whether the notes were drawn in proper form to impose an obligation upon the company, and next, whether they were executed by one having authority to that end.

The complainants failed to produce a single one of these notes. Their contents, which would have been conclusive upon the question as to whether they were in form of binding force upon the company, could only be properly proved by their being put in evidence. It was a material point for complainant to prove, for the right of the complainants to an equitable title depended upon the company's liability being satisfactorily established, and not having proved it by the production of the notes, the conclusion must be that these notes were, in form, as the whole drift of the evidence tends to show, only the obligations of Scarlett & Scarlett, and not made in the corporate name of the complainants.

Again, the probabilities all indicate that the complainant corporation was not a party to this purchase. The deal involved the amount of $12,000, for one-half of which Scarlett & Scarlett were to be principal debtors and security for the other half. There is no pretence that any mention of a corporation was made at the time, and it is not likely a corporation with an actual capital of only $5,500 would have been accepted as debtor and endorser for $12,000. The fair presumption, I think, is that the vendors supposed they were dealing with the individuals William and John B. Scarlett. It is certain Charles Selvage so understood when he became endorser. While the old copartnership may have been dissolved, John, who alone had anything to do with the transaction (William being at the time in the west), could have acted in the name of Scarlett & Scarlett on the assumption that his brother would join him, on his return, in the purchase as a joint venture; and that John so regarded it is

clearly shown by his directions to Ward, as late as September, 1892, for drawing an agreement with reference to the stock, he then representing to Ward that it belonged to the brothers as copartners.

But if John B. Scarlett, when he signed "Scarlett & Scarlett" to the notes, really intended the corporation as the maker, and if we assume the corporation could be made liable on the notes signed in that way, yet if John B. Scarlett had no authority in the premises, the company were not bound by the notes signed by him until it adopted them as its own act.

On the 30th of April a meeting of the directors of "Scarlett & Scarlett, Incorporated," was held, at which William Scarlett and John B. Scarlett alone were present, and at which, according to the minutes, John B. Scarlett reported the purchase for the corporation of Scarlett & Scarlett of $2,500, par value, of the stock of the Newark Land and Improvement Company for the sum of $6,000, and it was moved to accept the action of John B. Scarlett, treasurer, as the act of Scarlett & Scarlett, and confirm the same,

"with a distinct understanding that in future the treasurer be requested to make no contract outside of the regular business of the company where the company assumes any liability beyond $500,"

which was carried. Until this action by the company the unauthorized act of John B. Scarlett had imposed no liability on the corporation and it had acquired no rights from such act.

What is the effect of this resolution ? It ratified and adopted the unauthorized action of John B. Scarlett, in respect of the purchase by him, in the name of Scarlett & Scarlett, of the stock from the Scheerers and the giving of notes for $6,000, and transferred to it all title which John B. Scarlett at that time controlled over the stock thus purchased, and its title thus acquired undoubtedly related back to the time of the purchase, with reference to so much of the stock he was in a position, on the 30th of April, to deliver to it; but it acquired no more of that stock than so much thereof as John B. Scarlett was in a position then to transfer to the company. The ratification of the purchase could

not affect any portion thereof which he had actually disposed of. If, without notice to the company that he had sold part, he induced it to assume a responsibility to pay for stock, all of which he could not deliver, his act to that extent was a fraud upon the company, for which they would have had their remedy against him, but cannot affect the title to that previously disposed of. But the only two directors present at the meeting at which the act of John B. Scarlett was ratified were himself and his brother William, both of whom had full notice of, and were parties to, the transfer to Ward, and this brings up the inquiry as to the legal effect of the transaction by which Mr. Ward acquired the share in dispute.

At the time of the transfer, John B. Scarlett having no authority whatever from the company for his action with reference to this stock, its purchase by him until adopted by the company was his personal transaction. Although the certificates stood in the name of Scarlett & Scarlett, John individually had possession of them—surrendered them by his personal act and endorsement, had new certificates issued which he also receipted for and of which he had possession and control on April 23d, when one was transferred to Ward. It is true that it was supposed that Ward was purchasing a share of stock from William Scarlett, but if John B. Scarlett was willing to carry into effect such understanding by a transfer of his own stock, no one can raise any objection to his doing so. It was frankly admitted by counsel on the argument, in answer to a question from the court, that if John B. Scarlett had disposed of this stock or any portion of it, prior to the passage of the resolution on April 30th, 1892, to a person who had paid the cash therefor, the company would have acquired no title by the subsequent ratification of the purchase by John B. Scarlett. But it is claimed that such rule would be adopted to protect a *bona fide* purchaser for value paid, and that Mr. Ward has not parted with anything of value for his share. Ward has not, in fact, paid for the stock, although he did at one time offer his check, which was declined, but not on the ground that such was not a legal tender, and by his answer he tenders himself ready and willing at any time to pay

the purchase-price agreed, besides he has on the faith of this transfer materially changed his position—he accepted the office of director, acted as such, giving his time, attention, knowledge. and services to the corporation from that time to this.

But I do not understand that the rule of a *bona fide* pur-- chaser for value is to be applied in this case. If the company had, in fact, title, either legal or equitable, which by apparent authority had, in fraud of its rights or other wrong, come into the possession of another, the rule of a purchaser for value would be invoked with success, but in the case suggested the stock is sold before the company acquires any title, and its power to get it by subsequent action is gone. The conclusiveness of the transfer by the assumed agent prior to ratification, depends on whether such party had the right of disposal, and whether the formalities of the transaction were sufficient to pass the title. The giving of an unauthorized note for the stock to Scheerer gave him a right of action against John B. Scarlett, but, as stated, it gave the company no right to the stock until it ratified Scarlett's act. Until that time the company was not liable for the purchase-money and could suffer no loss, and, so far as the company was concerned, the stock was John B. Scarlett's individually and to which he could give title. Did he do so?

As stated, Ward never had the original certificate issued to Scarlett & Scarlett, in the possession of John B. Scarlett. He had no knowledge to whom that original certificate had been issued or notice that it stood in the name of Scarlett & Scarlett. The land company accepted the surrender as properly made by John B. Scarlett, and issued a new certificate to Frederic W. Ward. What he got was a certificate of the company, regularly issued, that he was entitled to one share of the capital stock. The general rule, as stated in *Cook Stock.* § *369*, is that the rights and equities of all holders of stock back of the registry and issue of the certificates in existence are not allowed to affect the stockholdership or rights of purchasers of these new certificates, citing *Buffalo G. A. Co.* v. *Alberger, 22 Hun 349; Mandelbaum* v. *N. A. M. Co., 4 Mich. 465.* It is true, he further says (at § *443*), with reference to certificates which have been stolen or

14

misappropriated and the endorsement forged, that "the person who obtains registry first, after the illegal act has been done, is not protected" by the rule stated. This exception, I take it, is founded on the fact that the person who so obtains registry has had possession of the certificate and forged endorsement, and has thus been put on inquiry as to whether it is genuine, and has used it without such inquiry, and still holds the fruit of the fraud effected by the forgery. Here, however, there was no notice brought to Ward—he did not obtain the registry, he had not even constructive notice. Nothing is shown to attack his good faith or his character as a *bona fide* purchaser. Besides, this is not a case of a stolen certificate or one transferred in breach of trust. It has been shown that John B. Scarlett must be considered as having at the time the right to dispose of it, and the only question is, did he dispose of the stock in such manner as to transfer the title? A certificate for the one share of the stock was surrendered by him, accepted by the land company, and a new one issued to Ward in his own name in proper form, under the seal of the corporation, signed by the officers, was actually delivered to Ward, for which he agreed to pay the sum of $120, and the material payment of which money was waived at the time, and credit for its payment in the future was personally given to him. In *1 Shep. Touch. 224*, it is said:

"But if one sell me a horse or any other thing for money or any other valuable consideration, and the same thing is to be delivered to me at a day certain, and by our agreement a day is set for the payment of the money; or all or part of the money is paid in hand; or I give earnest-money (although it be but a penny) to the seller; *or I take the thing bought by agreement into my possession, where no money is paid, earnest given or day set for the payment;* in all these cases there is a good bargain and sale of the thing to alter the property thereof."

And Mr. Benjamin, in his work on *Sales*, quoting this passage at § *315*, says: "This rule given by this ancient author remains substantially the law of England to the present time."

The transaction on the part of John B. Scarlett was executed, the stock was transferred and the new certificate delivered; the day of payment was, by consent, left indefinite. By all rules of

Scarlett & Scarlett v. Ward.

law the title to the thing sold passed to the vendee and the stock became the property of Mr. Ward. This being the case, all that the complainant acquired by its ratification on the 30th of April was to forty-nine shares of the stock which John B. Scarlett had purchased from the Scheerers—he had disposed of the remaining share beyond his recall. He must answer to the company for his inability to deliver to his company the whole amount.

But I fail to see how the complainant has any legal or equitable claim which can be enforced upon the particular certificate issued to Mr. Ward.

This bill seeks to have this court decree a retransfer of the stock to the complainant, and that the certificate issued therefor to Frederick W. Ward be declared null and void, and that Ward be required to deliver the same up to the complainant to be canceled; that Ward and the company be enjoined from disposing of or transferring the stock and Ward from acting as a director, and that he give complainants a proxy to vote thereon and for other relief.

The complainant's right, if any, is to certificate No. 26, which was issued in the name of Scarlett & Scarlett. If it, being its property, was surrendered without authority and unlawfully to the land company, and has been now canceled, its remedy is to follow that certificate, either at law to recover its value or possession of the thing itself, or in this court to efface its cancellation and rehabilitate it as a valid certificate. I see no principle by which it is entitled to this particular certificate held by the defendant Ward. These views render unnecessary any consideration of the other points which have been raised, and I advise that the bill be dismissed.